Filed 4/28/15  P. v. Armstrong CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C068330 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F05757) |
| v. | |
| MICHAEL LEE ARMSTRONG et al., | |
| Defendants and Appellants. | |

After his cousin told him she had been raped, defendant Phillip Gonzales, with defendant Michael Armstrong and others, went to confront the alleged rapist.  Gonzales started a fight and then Armstrong fired a handgun several times, killing Everett Taylor and Deshawn Holloway.  Separate juries found Gonzales and Armstrong each guilty of two counts of second degree murder.  (Pen. Code, §§ 187, 189.)[1]  The respective juries

---

[1] Further undesignated statutory references are to the Penal Code.

found firearm enhancements true as to Gonzales (§ 12022, subd. (a)(1)) and Armstrong (§ 12022.53, subd. (d)).  The trial court sentenced Gonzales to 31 years to life in prison and Armstrong to 55 years to life.  Both timely appealed.

On appeal, Gonzales raises several challenges relating to the natural and probable consequences doctrine and sentencing, and contends the trial court erred in denying his petition for access to juror information.  Armstrong contends his confession was involuntary and his sentence was unlawful.  We agree with only Armstrong's second contention.  The trial court erred in running one of the firearm enhancements concurrent; under section 12022.53, the enhancement must be run consecutive if the sentences on the underlying murders are run consecutive (as they were in this case.)  We remand for resentencing as to Armstrong.  Otherwise, we affirm.

**FACTS**

*The Parties*

Defendant Gonzales lived on Milford Avenue with his girlfriend Ashley Armstrong.  Defendant Armstrong, Ashley's brother, also lived there with his girlfriend.  Gonzales had two younger brothers, Jason and Anthony.  Priscilla Ramirez, who was 19 years old, was Gonzales's cousin.  She had three sisters--Angelica, Theresa, and Jessica.  Jessica lived at the Seavey Circle housing complex, which was known as the projects.

Ramirez was in an intimate relationship with Everett Taylor, who lived at the complex on Seavey Circle.  Taylor's friend Holloway also lived there.  Taylor also was in a relationship with Veronica Clewis; some called her his "project wife."  Ramirez and Clewis were jealous of each other over Taylor.  After the shooting, Ryan Walters, a childhood friend who was staying with Taylor, told the police Taylor had been "really dealing" with Ramirez lately.  Walters described Taylor's love life as " 'a hundred bitches.' "  At one point, Ramirez and Clewis got in a fight over Taylor.  Taylor came out to the fight; he took the side of Clewis and told Ramirez to "get lost."  Ramirez was angry.

2

*The Shooting*

On July 21, 2009, there was a birthday party for Ramirez's sister Theresa. Ramirez was there; she had a black eye from a fight with another girl. Taylor attended the party and talked with Ramirez. Taylor left the party with Ramirez's sister Jessica. That night Ramirez sent Taylor the following text messages.

"8:26 p.m.: 'Thats what I fuckin thought everett. Obviously u fuckin wit her its SO GOOD. BYE. *PRI$CILLA.'

"8:27 p.m.: 'Bye dude thats it BYE. 4REALS. *PRI$CILLA.'

"8:41 p.m.: 'You didnt even cum back that says it all Evette [*sic*]. Huh? *PRI$CILLA.'

"8: 44 p.m.: 'N i thought u was cumn home with me. So u was lyn to me? *PRI$CILLA.' "

Taylor did not respond to any of these messages.

That day was also Gonzales's birthday and he had a party. Ramirez called him and said she had been raped.[2] Gonzales called his brothers; Anthony answered and Gonzales asked for Jason. Gonzales asked Jason to meet him at their grandfather's.[3] Gonzales said something about not talking on the phone. Jason left, taking Anthony's car. On his way there, Jason saw Gonzales at a Shell gas station and stopped. Surveillance video from the gas station showed Gonzales approaching Jason's car, leaning in towards the driver, and then putting something in his pocket. Jason claimed the meeting was coincidental and he gave Gonzales a bag of marijuana for his birthday. Neither Gonzales nor Jason mentioned this stop at the gas station in their statements to police.

---

[2] There was no evidence that Ramirez had been raped. The parties agreed it was a lie.

[3] Jason testified under a grant of use immunity.

At their grandfather's, Jason got in Gonzales's SUV. Armstrong was in the front passenger seat, and Ramirez was in the back. She was crying, smelled like alcohol, and had a black eye. They drove to Seavey Circle. According to Jason, Armstrong asked what they were going to do, but Gonzales did not answer. Jason told the police, however, that Gonzales responded they were going to knock on the door "and see." As they pulled into the parking lot, Ramirez pointed to Taylor and said, " 'That's him.' "

Walters was out front with Taylor and Holloway. Gonzales and Armstrong approached them and asked, " 'Who's E [Everett]?' " Gonzales grabbed Taylor and Walters hit Gonzales. Armstrong pulled out a gun. Walters, Taylor, and Holloway began running and heard shots. After the third shot, Holloway said he was hit. Gonzales's SUV sped off.

Holloway died at the scene. He had been shot twice in the back. The fatal shot hit his left lung and subclavian vein. Taylor was taken to the hospital. He had been shot three times. He died from a gunshot wound to the back of his head. Immediately after the shooting, as they fled the scene, Armstrong blurted out (referencing Holloway): " '[O]ooh, did you see that guy's back?' "

After the shooting, Ramirez said, " 'Nobody say shit. That's how people get caught.' " She broke her cell phone and had Jason throw it out the window. Both Jason and the police saw several pictures of Taylor at Ramirez's. To Jason it looked like a memorial to Taylor--the man who Ramirez claimed had raped her. At that point, Jason thought Ramirez had taken advantage of him.

*Defendants' Statements*

About a week after the shooting, the police saw Gonzales and stopped him; they asked him to come to the office. Detective Keller interviewed Gonzales and a tape of the interview was played to Gonzales's jury.

The interview began with Keller asking about Gonzales's distinctive "candy purple" SUV and what had happened to it. Gonzales claimed he had sold it to "Juan."

4

Defendant was read his *Miranda*[4] rights and Keller said he wanted to talk about the murder. At first, Gonzales said he did not know anything. Later, Gonzales said he did not pull the trigger; he just drove. Armstrong did the shooting.

Gonzales said Ramirez called, crying. She said she needed help; it was an emergency. He and Armstrong went to her. She said she had been raped. Gonzales was going to fight the victims. Gonzales asked who was "E" and then Gonzales pushed Taylor and they began fighting. After two punches, Armstrong began shooting.

When they picked up Ramirez, she was very emotional. She said Taylor had raped her twice and beaten her. She asked them to take her to Seavey Circle where her sister lived. When they pulled up, Ramirez identified Taylor, saying " 'that's him.' "

Gonzales admitted he planned on fighting Taylor when he confronted the group of men at Seavey Circle. He claimed he did not know the shooting would happen and it "wasn't supposed to happen." He had seen Armstrong with a gun before; he always carried a gun. Gonzales claimed he did not know Armstrong had a gun that night, but Armstrong had a gun most of the time because he had a lot of problems. When Keller asked if Armstrong would shoot at the police, Gonzales responded, "He's unpredictable and I don't know him anymore."

Gonzales's mother and stepfather testified before his jury. They confirmed that he had told them about Ramirez's call and her claim that she had been raped. Ramirez wanted someone beat up. Gonzales and Armstrong took Ramirez with them to point out "E." They planned to beat him up. The shooting began as soon as Gonzales threw a punch. Gonzales denied he knew Armstrong had a gun. Gonzales was crying when he talked about the shooting.

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

Detective Keller also interviewed Armstrong.  A tape of this interview was played to Armstrong's jury.

Armstrong described three different versions of the events surrounding the shooting.  In the first, he stayed in the car while Gonzales and Jason got out.  In the second version, Armstrong said he got out of the car only to break up the fight after it had started; he then got punched.  Gonzales was the gunman and Armstrong went to back him up.  In the final version, Armstrong said he had a gun that Gonzales had given him.  The man he was fighting tried to reach in Armstrong's pocket, so Armstrong pulled out the gun and it went off.  Armstrong shot at the ground, trying to scare him.  Armstrong claimed the shots were all accidental; he was afraid for his life and the other guy was grabbing for the gun.  Armstrong claimed Gonzales had several guns, but he could not afford a gun.  He explained the guns in pictures on his MySpace page were not his, but belonged to Gonzales.[5]

Armstrong said that Ramirez said she had been raped twice and wanted them to " 'get that mother fucker' " and " 'fuck him up.' "  She told Gonzales that if his father were there, her attacker would be dead.  Armstrong quoted Ramirez as saying, " 'I want you to shoot him in the dick.  Blow his dick off so he don't use it no more.' "  Armstrong reported that Gonzales called his brother Jason and asked him to bring the "thing" in the garage.  Jason handed Gonzales something at the gas station and Gonzales put it in his shirt.  Armstrong said it was a gun wrapped in a shirt.  Later, he said the gun was in a gun case.  He also said he thought the thing exchanged might be marijuana because the car

_____

[5] Gonzales's brother Anthony assisted the police in accessing Armstrong's MySpace page, which contained a picture of a rifle and a handgun; no one was holding them. Anthony, who did not like Armstrong, had once seen Armstrong with a gun and told the police that Armstrong did not like to leave the house without a gun.

smelled like it.  After this interview, the police obtained the surveillance video from the gas station.

## DISCUSSION

## I

### *Gonzales's Contentions*

A.  *Sufficiency of the Evidence*

As to Gonzales, the case was tried on the theory that the shooting was the natural and probable consequence of the assault on Taylor, and Gonzales either conspired with Armstrong to commit that assault or aided and abetted that assault.  Gonzales contends there is insufficient evidence that the shooting was a natural and probable consequence of the planned assault.  He asserts there is no evidence that he intended that Armstrong use a firearm or encouraged him to do so, so his intended crime was only simple assault.  He distinguishes cases that have found a killing the natural and probable consequence of a simple assault because those were gang cases.  Unlike the gang context, with its inherent violence and animosity between rival gang members, Gonzales contends here it was not reasonably foreseeable that Armstrong would pull out a gun and shoot two unarmed, fleeing men.

1.  The Law

" ' "A person who knowingly aids and abets criminal conduct is guilty of not only the intended crime [target offense] but also of any other crime the perpetrator actually commits [nontarget offense] that is a natural and probable consequence of the intended crime." ' [Citations.]  'Thus, for example, if a person aids and abets only an intended assault, but a murder results, that person may be guilty of that murder, even if unintended, if it is a natural and probable consequence of the intended assault.' [Citation.]

"A nontarget offense is a 'natural and probable consequence' of the target offense if, judged objectively, the additional offense was reasonably foreseeable.  [Citation.]  The

7

inquiry does not depend on whether the aider and abettor actually foresaw the nontarget offense. [Citation.] Rather, liability ' "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." ' [Citation.] Reasonable foreseeability 'is a factual issue to be resolved by the jury.' [Citation.]" (*People v. Chiu* (2014) 59 Cal.4th 155, 161-162.)

The natural and probable consequences doctrine is also applied in cases involving the liability of conspirators for substantive crimes committed in the course of a conspiracy. (*People v. Prieto* (2003) 30 Cal.4th 226, 249-250; *People v. Hardy* (1992) 2 Cal.4th 86, 188.)

The specific acts need not be foreseeable, only the resulting harm. " 'The consequence need not have been a strong probability; a possible consequence that might reasonably have been contemplated is enough. . . . The precise consequence need not have been foreseen; it is enough that the defendant should have foreseen the possibility of some harm of the kind that might result from his act. [Citations.]' [Citation.]" (*People v. Fiu* (2008) 165 Cal.App.4th 360, 373-374.)

"Murder . . . is *not* the 'natural and probable consequence' of 'trivial' activities. To trigger application of the 'natural and probable consequences' doctrine, there must be a close connection between the target crime aided and abetted and the offense actually committed." (*People v. Prettyman* (1996) 14 Cal.4th 248, 269.) Murder can be the natural and probable consequence of simple assault. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 300 [rejecting contention that simple assault cannot, as a matter of law, serve as the target offense for murder liability under the natural and probable consequences doctrine]; *People v. Caesar* (2008) 167 Cal.App.4th 1050, 1056 [assault and battery following traffic accident, non-gang context], disapproved on other grounds in *People v. Superior Court (Sparks)* (2010) 48 Cal.4th 1, 18; *People v. Montes* (1999)

8

74 Cal.App.4th 1050, 1054-1055 [simple assault and breach of peace not trivial in gang context].)

The standard of review for determining the sufficiency of the evidence is well settled. "[T]he court must review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence--that is, evidence that is reasonable, credible, and of solid value--such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578; see also *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].)

### 2. Analysis

There was evidence from which the jury could conclude that when Gonzales brought Armstrong to the confrontation with Taylor, it was reasonably foreseeable Armstrong would use a gun. The situation was emotionally charged. Ramirez, who was crying and had a black eye, claimed she had been raped and beaten. She wanted revenge; she wanted her assailant beaten. Gonzales intended to do her bidding and beat up Taylor. He took both Armstrong and Jason with him. Armstrong was eager to participate, asking what to do when someone answered the door. Gonzales intended violence and harm to Taylor.

Gonzales had good reason to know that Armstrong had a gun with him. Gonzales told Detective Keller that he had seen Armstrong with a gun. Indeed, Gonzales said Armstrong "always has a gun." Armstrong carried a gun most of the time because "he has a lot of problems." Gonzales's brother Anthony told the police Armstrong did not like to leave the house without a gun. Anthony had seen Armstrong with a gun. Jason had also seen Armstrong with a gun, showing it to a friend. Armstrong's MySpace page had a picture of guns.

That Armstrong might use the gun was reasonably foreseeable. The purpose of the trip to Taylor's was vengeance. Gonzales described Armstrong as "unpredictable."

9

He knew Armstrong had been to jail. Armstrong was eager to be involved in the plan for revenge and his character was shown by his gloating after the shooting; " 'Oooh, did you see his back?' "

Substantial evidence supports Gonzales's murder conviction.

B. *Instructional Error*

Gonzales contends the trial court erred in instructing on the natural and probable consequences doctrine. He asserts the court's instruction told the jury that Gonzales could be guilty only of the same crime as Armstrong. Relying on *People v. Woods* (1992) 8 Cal.App.4th 1570, Gonzales contends the jury should have been instructed that he could be guilty of a lesser crime than the actual perpetrator. "[I]n determining aider and abettor liability for crimes of the perpetrator beyond the act originally contemplated, the jury must be permitted to consider uncharged, necessarily included offenses where the facts would support a determination that the greater crime was not a reasonably foreseeable consequence but the lesser offense was such a consequence." (*Id*. at p. 1588.) Gonzales contends the effect of the instructional error was to render the lesser offense of voluntary manslaughter unavailable to him.

1. The Instructions

The People requested a change to the CALCRIM pattern instructions on the natural and probable consequences doctrine. The People's concern was that a layman would interpret "probable" to mean a 51 percent or greater chance of happening. The People requested to change the instruction to substitute "reasonable foreseeability" for "probable." The trial court denied the request. During closing argument, counsel for Gonzales argued that "[a] lot of people think natural and probable means greater and lesser. A lot of people think 51 percent, or something like that. Probable means it's going to happen. It's more likely to happen." The People objected, arguing that defense counsel had incorrectly "equate[d] the term *natural and probable* consequence to [] *proof by 51 percent*" as had originally been the prosecutor's concern, and his reason for asking

10

for the substitution in the instruction of the word probable.  The trial court found the point "well taken" and later agreed to add additional language to the pattern instructions, italicized below.

The trial court instructed Gonzales's jury as to the natural and probable consequences doctrine as it applies to aiding and abetting, by modifying the language of CALCRIM No. 403 as follows:

"Before you may decide whether the defendant is guilty of murder or manslaughter, you must decide whether he is guilty of assault with a firearm or simple assault.

"To prove that the defendant is guilty of murder or manslaughter, the People must prove that:

"1.  The defendant is guilty of assault with a firearm or simple assault;

"2.  During the commission of assault with a firearm or simple assault a co-participant in that assault with a firearm or simple assault committed the crime of murder or manslaughter;

"AND

"3.  Under all of the circumstances, a reasonable person in the defendant's position would have known that the commission of the murder or manslaughter was a natural and probable consequence of the commission of the assault with a firearm or simple assault.

"A *co-participant* in a crime is the perpetrator or anyone who aided and abetted the perpetrator.  It does not include a victim or innocent bystander.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes. *The law does not fix a percentage of certainty to the term 'natural and probable consequences.'  The question is not whether the aider and abettor or co-conspirator actually foresaw the additional crime, but whether, judged objectively, it was reasonably foreseeable*.  In deciding whether a

11

consequence is natural and probable, consider all of the circumstances established by the evidence.  If the murder or manslaughter was committed for a reason independent of the common plan to commit the assault with a firearm or simple assault, then the commission of murder or manslaughter was not a natural and probable consequence of assault with a firearm or simple assault.

"To decide whether the crime of murder or manslaughter was committed, please refer to the separate instructions that I will give you on those crimes.

"The People are alleging that the defendant originally intended to aid and abet assault with a firearm or simple assault.

"If you decide that the defendant aided and abetted one of these crimes and that murder or manslaughter was a natural and probable consequence of that crime, the defendant is guilty of murder or manslaughter.  You do not need to agree about which of these crimes the defendant aided and abetted."  (First italics in original, last italics added.)

The trial court instructed Gonzales's jury as to the natural and probable consequences doctrine as it applies to conspiracy, by modifying the language of CALCRIM No. 417 as follows:

"A member of a conspiracy is criminally responsible for the crimes that he conspires to commit, no matter which member of the conspiracy commits the crime.

"A member of a conspiracy is also criminally responsible for any act of any member of the conspiracy if that act is done to further the conspiracy and that act is a natural and probable consequence of the common plan or design of the conspiracy.  This rule applies even if the act was not intended as part of the original plan.  Under this rule, a defendant who is a member of the conspiracy does not need to be present at the time of the act.

"A *natural and probable consequence* is one that a reasonable person would know is likely to happen if nothing unusual intervenes.  *The law does not fix a percentage of*

12

*certainty to the term 'natural and probable consequences.'  The question is not whether*

*the aider and abettor or co-conspirator actually foresaw the additional crime, but*

*whether, judged objectively, it was reasonably foreseeable.*  In deciding whether a

consequence is natural and probable, consider all of the circumstances established by the

evidence.

"A member of a conspiracy is not criminally responsible for the act of another

member if that act does not further the common plan or is not a natural and probable

consequence of the common plan.

"To prove that the defendant is guilty of the crime murder charged in Counts 1 and

2, or of the lesser crime of manslaughter, the People must prove that:

"1.  The defendant conspired to commit one of the following crimes:

assault with a firearm or simple assault;

"2.  A member of the conspiracy committed murder or manslaughter to

further the conspiracy;

"AND

"3.  Murder or manslaughter were natural and probable consequences of the

common plan or design of the crime that the defendant conspired to commit."  (First

italics in original, last italics added.)

### 2.  Analysis

First, we reject Gonzales's argument that the jury was told it had to convict him of

the same crime as Armstrong, rather than a lesser crime.  The instructions consistently

provided the alternative--"murder *or* manslaughter"--both as to the crime committed and

the crime that was reasonably foreseeable.  The instructions focused on determining

which crime was the natural and probable consequence or reasonably foreseeable.

Nothing in the instructions expressly told the jury the crimes Gonzales and Armstrong

committed had to be the same.  The Gonzales jury was instructed on both crimes.  This is

not a case like *Woods*, where the jury questioned whether it could convict the defendant

13

of a lesser crime and was expressly told it could not convict the aider and abettor of second degree murder if the perpetrator was guilty of first degree murder. (*People v. Woods, supra,* 8 Cal.App.4th at p. 1579.) Here, the jury did not ask about the natural and probable consequences doctrine and nothing indicates the jury considered manslaughter for Gonzales, but believed it could not convict him of that crime if they believed Armstrong committed murder.

"A defendant challenging an instruction as being subject to erroneous interpretation by the jury must demonstrate a reasonable likelihood that the jury understood the instruction in the way asserted by the defendant. [Citations.]" (*People v. Cross* (2008) 45 Cal.4th 58, 67-68.) Gonzales has failed to carry that burden.

Second, the evidence does not support a finding of manslaughter, so any error in failing to specifically instruct the jury that it could convict Gonzales of a lesser crime than Armstrong was harmless. Gonzales contends manslaughter was reasonably foreseeable due to the heat of passion caused by Ramirez's inflammatory charge of rape. We disagree, based on the particular facts of *this* case, because the evidence does not show either Gonzales or Armstrong acted under the heat of passion.

"Heat of passion arises if, ' "at the time of the killing, the reason of the accused was obscured or disturbed by passion to such an extent as would cause the ordinarily reasonable person of average disposition to act rashly and without deliberation and reflection, and from such passion rather than from judgment." ' [Citation.] Heat of passion, then, is a state of mind caused by legally sufficient provocation that causes a person to act, not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) No specific type of provocation is required, but it cannot be revenge. (*People v. Breverman* (1998) 19 Cal.4th 142, 163.) "[T]he killing must be 'upon a sudden quarrel or heat of passion' [citation]; that is, 'suddenly as a response to the provocation, and not belatedly as revenge or punishment. Hence, the rule is that, if sufficient time has elapsed for the passions of

14

an ordinarily reasonable person to cool, the killing is murder, not manslaughter.' "
(*People v. Daniels* (1991) 52 Cal.3d 815, 868.)

There certainly may be circumstances where a claim of rape is sufficient provocation to make a heat of passion killing foreseeable. Here, however, the evidence of events before the shooting does not support a finding that a killing due to heat of passion was foreseeable. There was no evidence that either Gonzales or Armstrong was acting under a heat of passion. While Ramirez was Gonzales's cousin, there was no evidence they were close. Ramirez was seven years younger and Gonzales did not spend significant time with her. Ramirez did not often attend family events with Gonzales and his family. Ramirez made a potentially highly inflammatory accusation of rape, but there is no evidence that Gonzales and Armstrong acted rashly in immediate response. It was Ramirez who demanded that her alleged assailant be beaten; Gonzales and Armstrong merely complied. The impetus for action came from Ramirez, not from the aroused passion of Gonzales and Armstrong.

Rather than a sudden response to the claim of rape, Gonzales engaged in planning activity; he took time to assemble backup, both Armstrong (who was with him) and his brother Jason (who had to be awoken). Then, Gonzales stopped at a gas station--whether simply to get gas which coincided with a chance meeting with Jason, as the defense claimed, or as a prearranged rendezvous to collect something (a gun) from Jason, as the prosecution claimed. Nothing on the surveillance video--where Gonzales goes to the cashier, pumps gas, and meets with his brother--suggests his reason was obscured by passion. Jason did not describe either Gonzales or Armstrong as inflamed. Indeed, according to Jason's version of events, the situation was calm enough that he gave Gonzales a birthday present at the gas station. The actions of Gonzales and Armstrong indicated they sought revenge for the alleged rape of Ramirez, not that they acted rashly in response to hearing of the alleged rape. Since the evidence does not support a finding

15

that manslaughter was the natural and probable consequence of the assault, any error in the instruction on this point is harmless.

C. *Prosecutorial Misconduct*

Gonzales contends the prosecutor committed misconduct in closing argument and his counsel was ineffective in failing to object. He contends the prosecutor argued to the jury that any consequence that was not "freakish," such as lightening striking the victim, or "bizarre," such as Armstrong shooting a stranger to the confrontation based on personal animus, was a natural and probable consequence. Gonzales contends this argument was misconduct because it "erroneously conveyed that there was no middle ground between a natural and probable consequence and a freakish or bizarre consequence."

1. Background

A major issue in Gonzales's case was the application of the natural and probable consequences doctrine, whether the killings were the natural and probable consequence of the assault. As discussed, there was discussion and disagreement as to how likely the consequence had to be to qualify as a natural and probable consequence.

In discussing the natural and probable consequences doctrine in closing argument, the People began by quoting from the jury instruction. "A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes." The prosecutor then gave hypotheticals to show what would not be a natural and probable consequence. The first was that Gonzales pushed Taylor and Taylor was struck by lightning and died. "That is not a natural and probable consequence of this beatdown. That is just a freakish occurrence." The second hypothetical was that Gonzales and Armstrong go to assault Taylor, and when they arrive, Armstrong sees someone he has hated since high school and takes the opportunity to shoot him. "That is not a natural and probable consequence. No reasonable person in the shoes of Phillip Gonzales could have anticipated that something as bizarre as that could have happened."

16

The prosecutor then discussed the facts of the case, concluding that Gonzales and Armstrong approached three men on their turf in the projects with "an equalizer," a gun. "So the question before you then, ladies and gentlemen, is, is it a natural and probable consequence of a beatdown that somebody will get shot when you know the person you're with has got a gun. That's not a freakish occurrence. That is something that any reasonable person would know is a likely occurrence. Any reasonable person would know that could happen. [¶] And think about this: What in fact happened. Phillip Gonzales begins using physical force, Everett Taylor's friend tried to help. Is that reasonably foreseeable under the circumstances? Of course it is. Natural and probable consequence. Anybody would understand that friends would come to friends who were being attacked. And under those circumstances Michael Armstrong would whip out that gun and start to use it, that's not a freakish occurrence. That is not freakish at all. It's a natural and probable consequence of that behavior."

There was no objection to this argument.

### 2. The Law and Analysis

"For a criminal act to be a 'reasonably foreseeable' or a 'natural and probable' consequence of another criminal design it is not necessary that the collateral act be specifically planned or agreed upon, nor even that it be substantially certain to result from the commission of the planned act. For example, murder is generally found to be a reasonably foreseeable result of a plan to commit robbery and/or burglary despite its contingent and less than certain potential. [Citations.]" (*People v. Nguyen* (1993) 21 Cal.App.4th 518, 530-531.) The question has been phrased as "whether the collateral criminal act was the ordinary and probable effect of the common design or was a fresh and independent product of the mind of one of the participants, outside of, or foreign to, the common design." (*Id*. at p. 531; see *People v. Luparello* (1986) 187 Cal.App.3d 410, 444.) There is no set degree of certainty necessary for finding a natural and probable consequence. (See *United States v. Powell* (D.C. Cir. 1991) 929 F.2d 724, 726

17

[describing a "natural and probable consequence" as covering a broad range from substantial probability of occurrence (e.g., 20 percent chance) to practical certainty, dependent on the circumstances].)

It is misconduct for the prosecutor to misstate the applicable law.  (*People v. Boyette* (2002) 29 Cal.4th 381, 435)  When the issue of alleged prosecutorial misconduct " 'focuses on comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203.)

It is unlikely the jury understood the People's argument to set forth a different standard for a natural and probable consequence than "one that a reasonable person would know is likely to happen if nothing unusual intervenes."  While the prosecutor used the terms "freakish" and "bizarre" in discussing what was not a natural and probable consequence, he told the jury the judge would instruct on the law and quoted from the jury instruction.  In rebuttal, the prosecutor argued this case was not the usual fistfight; instead, there was a car full of young men and an angry woman seeking vengeance for a rape, and Gonzales knew one man was armed.  In that circumstance, the shooting was reasonably foreseeable.

Further, the court instructed the jury:  "You must follow the law as I explain it to you, even if you disagree with it.  If you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."  As discussed *ante,* the jury was correctly instructed on the natural and probable consequences doctrine.  We presume the jury followed the trial court's instructions and nothing in the record shows otherwise; therefore, we conclude the jury followed the trial court's instructions and applied the correct standard for the natural and probable consequences doctrine. (*People v. Mickey* (1991) 54 Cal.3d 612, 689, fn. 17.)  Any error in the prosecution's closing argument was thus harmless and Gonzales has failed to establish his counsel's

18

representation fell below an objective standard of reasonableness by failing to object, or to demonstrate prejudice.  (See *People v. Davis* (1995) 10 Cal.4th 463, 516.)

D.  *Denial of Request for Juror Information*

Gonzales contends the trial court erred in denying his petition pursuant to Code of Civil Procedure section 237 for juror identifying information.  He contends he made an adequate showing of good cause because he presented evidence that a juror in his case had learned Armstrong had told the police Ramirez told Gonzales and Armstrong to shoot Taylor.  Gonzales argues denial of the petition prevented him from developing a motion for a new trial based on juror misconduct.

1.  Background

After the jury reached its verdicts, Gonzales, represented by new counsel, petitioned the court for access to personal juror identification information.  Gonzales asserted the information was needed to determine whether there were grounds for a new trial due to (1) the verdict being decided " 'by any means other than a fair expression of opinion on the part of all the jurors,' " or (2) juror misconduct.  Gonzales claimed his jury knew of information that was presented only to Armstrong's jury and that undermined his defense.

The petition's main claim of juror misconduct was based on the declaration of Gonzales's aunt Dolores Gutierrez about an overheard conversation among jurors.  The day the case went to the jury, the Sacramento Bee published an article about the case.[6]  The article stated the prosecutor said Ramirez sent Gonzales and Armstrong off with specific instructions to shoot Taylor in the penis " 'so he don't use it no more.' "  Gutierrez stated that when she left the courtroom after the verdict, she overheard several

---

[6] Gonzales's counsel expressed concern to the court about this article.  Counsel decided the appropriate step was to re-admonish the jurors to avoid media coverage.  The trial court did so.

19

jurors talking in the parking lot where she was parked. "They also talked about there being no testimony in the trial about shooting one of the victims in the genitals as was said in the Bee." Gonzales claimed his jury used this information in deliberations and it came from either reading the Bee article or talking to the Armstrong jury.

Gonzales contended there was other evidence that the two juries spoke with each other, despite the court's admonition not to. The day after the verdicts, the Bee published another article about the case. In a comment to the Internet version of the article, the commenter identified himself as a juror in the Armstrong case and stated the non-shooter (Gonzales) was charged with only second degree murder, a fact the Armstrong jury had not been told. Gonzales contended the comment suggests communication between the two juries.

The court denied the petition, finding no good cause. There was only speculation based on an overheard conversation in a parking lot.

### 2. The Law

After a jury verdict in a criminal case, the court's record of personal juror identification information (names, addresses, and telephone numbers) is sealed. (Code Civ. Proc., § 237, subd. (a)(2).) "Any person may petition the court for access to these records. The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release of the juror's personal identifying information." (*Id*., subd. (b).) On a petition filed by a defendant or his or her counsel, a trial court may in its discretion grant access to such information when necessary to the development of a motion for new trial or "any other lawful purpose." (Code Civ. Proc., § 206, subd. (g).)

20

This court set forth the applicable test for good cause in *People v. Rhodes* (1989) 212 Cal.App.3d 541.[7]  The party seeking disclosure must make "a sufficient showing to support a reasonable belief that jury misconduct occurred, that diligent efforts were made to contact the juror[] through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial." (*Id*. at p. 552.)  There is no good cause where allegations of jury misconduct are speculative, vague, or conclusory.  (*People v. Wilson* (1996) 43 Cal.App.4th 839, 852.)

Trial courts have broad discretion to allow, limit, or deny access to jurors' personal contact information (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1091), and we review the denial of a petition filed pursuant to Code of Civil Procedure section 237 for an abuse of discretion (*People v. Jones* (1998) 17 Cal.4th 279, 317).

3. Analysis

The trial court did not abuse its discretion in denying the petition.  Accusations of misconduct coming from defendant's relatives are viewed with suspicion as the source is biased.[8]  (See *People v. Granish* (1996) 41 Cal.App.4th 1117, 1131.)  Although Gutierrez declared she was walking with a friend when she overheard the jurors, no declaration from the friend was provided to corroborate Gutierrez.  Further, as the People noted, it is unlikely the jurors, who have access to a juror parking lot near the courthouse, were walking through the parking lot where Gutierrez parked.[9]

---

[7]  Although *Rhodes* was decided before the revision of section 206 and the enactment of section 237 of the Code of Civil Procedure, the *Rhodes* test remains applicable.  (See *People v. Carrasco* (2008) 163 Cal.App.4th 978, 990.)

[8]  During trial, Armstrong's aunt was admonished to remain silent in the courtroom after she was accused of remarking that a witness was lying.

[9] The People requested the court take judicial notice of the jury parking lot and that on any given Friday, which is the day of the week this event allegedly occurred, the jury lot

21

Even giving full credit to Gutierrez's declaration, the single line about the conversation overheard in the parking lot provided only speculation that one or more of the Gonzales jurors read the Sacramento Bee article describing Ramirez's directive or heard of it from an Armstrong juror *before* rendering a verdict. The statement was made *after* the verdict was rendered. Gutierrez described a group of seven or eight jurors talking, but it is unclear if all of them were jurors on Gonzales's case; some may have been jurors on Armstrong's case. Or the jurors may have learned of the Bee article after they left the courtroom. That the Armstrong juror who commented on the subsequent Bee article knew Gonzales was charged with only second degree murder does not show there was communication between the juries. That juror could have learned the fact of Gonzales's charge after the trial.

E. *Consecutive Sentences*

Gonzales contends the trial court abused its discretion in sentencing him to consecutive sentences because the court relied on unreliable evidence in making its decision.

1. Background

At sentencing, Gonzales argued for concurrent sentences, arguing the crimes and their objectives were not independent, as the objective was to confront only one man. The People argued for consecutive sentences, arguing that defendants confronted multiple people and Gonzales knew Armstrong was armed. The People claimed the "bottom line" was that Gonzales knew Armstrong was armed either because Armstrong always was or because Gonzales gave him a gun that night. The trial court indicated it had no question that Gonzales knew Armstrong was armed. A significant factor was that Gonzales facilitated the arming. The court found Armstrong's statement to that effect

is able to hold all the jurors' cars as there are fewer jurors at the courthouse that day. The record does not contain a ruling on the motion.

22

credible. It found consecutive sentences appropriate. Gonzales objected to using facts not admitted in his trial and the court responded sentencing factors were not limited to the record of trial.

About a month later, the trial court recalled sentence pursuant to section 1170, subdivision (d). The order stated in part: "On July 7, 2011, this court imposed sentence on two counts of second degree murder to run consecutively with each other. At the time, this court concluded that defendant Gonzales had participated in providing the gun to the shooter, which was a significant consideration in choosing to impose consecutive sentencing. However, because the evidence on that issue was disputed and the question a close one, the court desires to recall the sentence and set the matter for a resentencing hearing, at which time the court will reconsider the specific question of whether defendant Gonzales did in fact figure into putting the gun into the shooter's possession."

At the hearing, the People relied on Armstrong's statement and the video from the Shell station. Defense counsel, who had substituted in after the trial, had nothing to offer as he had not gone through the file. The trial court imposed the same sentence.

2. The Law and Analysis

"It is well established that a trial court has discretion to determine whether several sentences are to run concurrently or consecutively. [Citations.] In the absence of a clear showing of abuse, the trial court's discretion in this respect is not to be disturbed on appeal. [Citation.]" (*People v. Bradford* (1976) 17 Cal.3d 8, 20.)

"Although not all the procedural safeguards required at trial also apply in a sentencing or probation hearing, such a hearing violates due process if it is fundamentally unfair. [Citation.] 'Reliability of the information considered by the court is the key issue in determining fundamental fairness' in this context. [Citation.] A court's reliance, in its sentencing and probation decisions, on factually erroneous sentencing reports or other incorrect or unreliable information can constitute a denial of due process." (*People v. Eckley* (2004) 123 Cal.App.4th 1072, 1080.) A sentencing court may consider a broad

23

range of information, but fundamental fairness "requires that there be a substantial basis for believing the information is reliable. [Citation.]" (*People v. Lamb* (1999) 76 Cal.App.4th 664, 683.)

In finding that Gonzales participated in providing the gun, the trial court relied on Armstrong's statement to the police that Gonzales called Jason and told him to bring the "thing" in the garage. Jason handed Gonzales something at the gas station and Gonzales put it in his shirt. Armstrong later unwrapped the gun. While Armstrong's credibility was suspect as he gave varying versions of events, this story was corroborated by the video from the gas station, video the police did not obtain until *after* Armstrong gave his statement. Further, it is significant that neither Gonzales nor Jason mentioned the stop at the gas station to the police. Finally, the story that Jason, after having been awoken and asked to participate as backup, brought Gonzales a birthday present of marijuana and just happened to see him at the gas station and stopped there to give it to him strains credibility. The corroboration of Armstrong's story provides a substantial basis for believing it is true.

The trial court did not abuse its discretion in sentencing Gonzales to consecutive terms.

F. *Cruel and Unusual Punishment*

At sentencing, the trial court indicated regret that it had no option between 15 to life and 30 to life plus the armed enhancement. Gonzales contends his counsel was ineffective for failing to offer such an option by arguing Gonzales's sentence was cruel or unusual and should be reduced. He relies upon *People v. Dillon* (1983) 34 Cal.3d 44, which provides that a statutory punishment violates the California prohibition against cruel or unusual punishment if "it is grossly disproportionate to the offense for which it is imposed." (*Id*. at p. 478 & fn. 25.) He claims that a consideration of " 'the nature of the offense and/or the offender, with particular regard to the degree of danger both present to

24

society' " compels the conclusion that his sentence constitutes cruel or unusual punishment.  (*Id*. at p. 479.)

"Article I, section 17 of the California Constitution prohibits infliction of '[c]ruel or unusual punishment.'  A sentence may violate this prohibition if ' "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." '  [Citation.]  [¶]  . . .  Defendant must overcome a 'considerable burden' to show the sentence is disproportionate to his level of culpability.  [Citation.]  Therefore, '[f]indings of disproportionality have occurred with exquisite rarity in the case law.'  [Citation.]"  (*People v. Em* (2009) 171 Cal.App.4th 964, 972.)

"The judicial inquiry commences with great deference to the Legislature.  Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches.  [Citations.]  Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive.  [Citations.]"  (*People v. Martinez* (1999) 76 Cal.App.4th 489, 494.)

"The main technique of analysis under California law is to consider the nature both of the offense and of the offender.  [Citation.]  The nature of the offense is viewed both in the abstract and in the totality of circumstances surrounding its actual commission; the nature of the offender focuses on the particular person before the court, the inquiry being whether the punishment is grossly disproportionate to the defendant's individual culpability, as shown by such factors as age, prior criminality, personal characteristics, and state of mind.  [Citations.]"  (*People v. Martinez, supra,* 76 Cal.App.4th at p. 494.)

Gonzales argues the nature of his offense was less serious than the usual second degree murder because he acted in the heat of passion and his guilt was "highly attenuated" under the natural and probable consequences doctrine.  Gonzales understates

his culpability. As discussed *ante*, the evidence did not show that Gonzales acted under the heat of passion. Rather, he instituted a violent, vigilante response to a false claim of rape. The jury found Gonzales did not merely participate in an assault, but that he engaged in criminal conduct that foreseeably resulted in the shooting death of two people. Further, he knew the "unpredictable" Armstrong was armed, and may have provided the weapon himself.

As to the nature of the offender, Gonzales had, as the trial court noted, a number of redeeming qualities. He was employed, having both a full-time and a part-time job, and had bought a house. He had only a single conviction, for which he received probation. While on probation, he reported regularly, suffered no violations, and had no documented incidents while in jail. While these facts weigh in favor of Gonzales, they are outweighed by the circumstances of his participation that establish his individual culpability. Unlike the defendant in *Dillon*, Gonzales was not an immature minor, but an adult and a father.

We find no constitutional violation in the sentence of 31 years to life. Accordingly, we reject Gonzales's contention that counsel was ineffective in failing to request a reduced sentence. "Counsel's failure to make a futile or unmeritorious motion or request is not ineffective assistance. [Citation.]" (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 836.)

II

*Armstrong's Contentions*

A. *Voluntariness of Armstrong's Confession*

Armstrong contends his confession was involuntary and its admission violated the Fifth and Fourteenth Amendments. He contends his confession was inadmissible for two reasons. First, it was involuntary because it was obtained by an implied promise of leniency--that if he talked to the police, he could avoid a multiple murder charge.

Second, he contends the interrogation did not stop when he requested counsel. Instead, Armstrong asserts he was tricked or cajoled into waiving his right to counsel.

        1. Background

Armstrong went to the police voluntarily. There, he was interviewed by Detective Keller. The interview was taped and a redacted version was played to Armstrong's jury.

At the beginning of the interview Keller read Armstrong his *Miranda* rights. Armstrong said he was scared of Gonzales and just wanted to "tell my story." Armstrong then told a version of events in which he stayed in the car. Keller told him, "You did the right thing by coming in, okay? 'cuz otherwise, it was just gonna be no good for anybody down the road. But to come in and not be 100% truthful, okay, is gonna put you in a bad, bad spot." Keller admonished Armstrong, "Don't . . . play with me." He told him that witnesses had identified him as being out of the car. "So, if you're gonna sit here with this B.S., I'm just gonna book you into the county jail for murder. Two counts of murder." Armstrong then claimed he engaged in the fight only to break it up.

Keller told Armstrong he had been identified as the shooter and Armstrong replied, "I didn't shoot nobody." Keller explained that Armstrong had been identified as the one who shot and killed two men and was going to be charged with double homicide. He asked Armstrong to explain why he did it rather than "just sitting here saying I didn't do it, okay?" Armstrong said, "if you're gonna accuse me of something, . . . I want to talk to an attorney or a lawyer." Keller said that was Armstrong's choice. He would like to talk to Armstrong some more, but if Armstrong wanted a lawyer, he could not. Armstrong then said, "I want an attorney." Keller responded, "Okay. We'll book you into county jail for double homicide." Armstrong asked if he would go out right then. Keller told Armstrong he would take him when he was ready and left the room.

The videotape shows Armstrong pacing about the interview room. He said, "It's fucked, you know. Where's this guy again? I want to talk to him. Yo, Detective?" Armstrong knocked and called for Keller. Keller returned and told Armstrong to sit

27

down. Armstrong began to tell him what happened that night, but Keller interrupted, "Okay, you said you wanted an attorney earlier, so--" Armstrong said, "No, I don't want no attorney, you [] know what I'm saying?" Keller asked if Armstrong wanted to talk to him; Armstrong responded "Yeah" and began to tell Keller what happened. Armstrong admitted he was the only one that fired a gun.

Armstrong moved to exclude his statement to Keller. He claimed his statements were the product of the detective saying if Armstrong did not talk, he would be booked for two homicides. He argued the clear message was that if Armstrong refused to talk, he would be booked for murder, and the equal message was that if he did talk, there might be no charge. Armstrong claimed he changed his story to conform to the detective's version only to avoid being charged. The motivation for the changed story came from the detective's implied promise, not from Armstrong.

The trial court denied the motion, finding that Armstrong's statements were the product of his own volition, not coercion or police misconduct.

2. The Law

"The Fourteenth Amendment to the federal Constitution and article I, section 15, of the state Constitution bar the prosecution from using a defendant's involuntary confession. [Citation.] [These provisions require] the prosecution to establish, by a preponderance of the evidence, that a defendant's confession was voluntary. . . . [¶] Under both state and federal law, courts apply a 'totality of circumstances' test to determine the voluntariness of a confession. . . . On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review. [Citations.] In determining whether a confession was voluntary, '[t]he question is whether defendant's choice to confess was not "essentially free" because his will was overborne.' [Citation.]" (*People v. Massie* (1998) 19 Cal.4th 550, 576.)

28

"It is well settled that a confession is involuntary and therefore inadmissible if it was elicited by any promise of benefit or leniency whether express or implied. [Citations.] However, mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary. . . . Thus, '[w]hen the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct,' the subsequent statement will not be considered involuntarily made. [Citation.] On the other hand, 'if . . . the defendant is given to understand that he might reasonably expect benefits in the nature of more lenient treatment at the hands of the police, prosecution or court in consideration of making a statement, even a truthful one, such motivation is deemed to render the statement involuntary and inadmissible. . . .' [Citations.]" (*People v. Jimenez* (1978) 21 Cal.3d 595, 611-612, overruled on other grounds in *People v. Cahill* (1993) 5 Cal.4th 478, 510, fn. 17.)

" 'Once a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. . . . Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. . . . [The police] are authorized to interview suspects who have been advised of their rights, but they must conduct the interview without the undue pressure that amounts to coercion and without the dishonesty and trickery that amounts to false promise.' [Citation.]" (*People v. Holloway* (2004) 33 Cal.4th 96, 115.) The test is whether the police "cross[ed] the line from proper exhortations to tell the truth into impermissible threats of punishment or promises of leniency." (*Ibid*.)

"[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." (*Edwards v. Arizona* (1981) 451 U.S. 477, 484 [68 L.Ed.2d 378, 386].) When an accused has "expressed his desire to deal with the police only through counsel," he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Id.* at pp. 484-485.) The request for counsel must be unequivocal. "[A]fter a knowing and voluntary waiver of the *Miranda* rights, law enforcement officers may continue questioning until and unless the suspect clearly requests an attorney." (*Davis v. United States*. (1994) 512 U.S. 452, 461 [129 L.Ed.2d 362, 373].)

### 3. Analysis

Armstrong contends the interview contained implied promises of benefit or leniency. He contends the interview contained the threat that if he did not talk he would be charged with a double homicide. The implied promise was that if he did speak, he could avoid those charges.

Armstrong relies on *People v. Cahill* (1994) 22 Cal.App.4th 296. In *Cahill*, the police officers urged the defendant to admit to a killing in order to show it was not premeditated and thus not first degree murder. The interrogating officer told defendant, " 'If I don't hear from you why this happened, I'm going back to Sacramento and I'm going to assume that this was a cold-blooded premeditated murder of this little lady.' " He also told defendant " 'there's all the difference in the world in planning to kill somebody,' " versus " 'getting caught in the middle of a burglary and maybe getting into a struggle or maybe even having some--the person that lives there attack you or something and just one thing leads to another. It's like night and day, you know.' " (*Id.* at pp. 305-306.) The officers also misled the defendant as to the state of the law by

30

telling him he would not face the death penalty if the killing was not premeditated and providing a detailed but materially deceptive account of the law of murder by omitting any reference to felony murder. The crime was committed during a burglary, so that an admission to involvement in the crime amounted to a confession to felony murder. (*Id*. at p. 315.) We found "the interrogation tactics amounted to a false promise," but the error in admitting defendant's confession was harmless due to the strength of the evidence against defendant. (*Id*. at p. 315; see also *id*. at pp. 318-319.)

There was no such false promise or deception here. Keller consistently told Armstrong he faced two counts of homicide or murder. He never promised or even suggested that a lesser crime or penalty--or no charge at all--was available if only defendant admitted some involvement in the crime. Rather, in seeking Armstrong's explanation of the shooting, Keller did no more than permissibly tell Armstrong it would be better if he told the truth. (*People v. Jimenez, supra,* 21 Cal.3d at p. 611.) Unlike in *Cahill*, Keller did not misrepresent the law of murder to get an admission from Armstrong. Throughout the interview, Keller made it clear that Armstrong would be booked on two counts of homicide based on the statements of witnesses identifying him as the shooter. How quickly that happened depended on whether he wanted to tell Keller what happened. (See *United States v. Harris* (S.D.Ala. 2009) 613 F.Supp.2d 1290, 1302 [exhortation to tell the truth because defendant was going to jail anyway not improper coercion].)

Armstrong next contends Keller did not immediately cease questioning when Armstrong requested counsel. He argues Keller's questions and statements were "intrinsically duplicitous and designed to trick or cajole Mr. Armstrong into waiver of counsel."

Armstrong has not preserved this contention for appeal because he did not raise an invalid waiver of the right to counsel below. "A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous

31

admission of evidence unless:  [¶]  (a)  There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion . . . ."  (Evid. Code, § 353.)  The rule requiring specificity applies to *Miranda*-based objections and motions to exclude.  (*People v. Milner* (1988) 45 Cal.3d 227, 236.)

In any event, the contention fails.  Armstrong first stated that if he were going to be accused of something, he wanted a lawyer.  A conditional request for a lawyer *if* defendant is going to be charged is not a clear invocation of the right to counsel.  (*People v. Gonzales* (2005) 34 Cal.4th 1111, 1126; *People v. Suff* (2014) 58 Cal.4th 1013, 1068 [" 'if I'm being charged with this I think I need a lawyer' "].)  When Armstrong clearly stated:  "I want an attorney," the questioning stopped.  It only resumed when Armstrong initiated contact and told Keller he no longer wanted an attorney.

The trial court did not err in admitting Armstrong's statement.

B.  *Unlawful Sentence*

The trial court sentenced Armstrong to 55 years to life in prison, consisting of consecutive terms of 15 years to life on the two murder counts and a consecutive term of 25 years to life on one gun use enhancement, but the court ran the second gun use enhancement concurrent.  Armstrong contends this is an unlawful sentence because the enhancement, section 12022.53, subdivision (d), requires "an additional and consecutive term of imprisonment in the state prison for 25 years to life."  The court cannot strike the enhancement or suspend imposition or execution of the sentence.  (§ 12022.53, subds. (g) & (h).)  Armstrong contends the court had two choices: to run the two murder counts with their gun use enhancements concurrently for a sentence of 40 years to life or to run them consecutively for a sentence of 80 years to life.

Armstrong contends his case must be remanded for resentencing on count two, the second murder charge.  He recognizes that resentencing may result in a longer sentence if the trial court runs both counts and their attendant enhancements consecutively.  He

32

reasons that the current sentence of 55 years to life is effectively a sentence of life without parole; there is the chance the court may run the sentence on the two enhanced murder counts concurrently; and the error could be identified at any time. We agree with appellate counsel that this "problem should be confronted directly" and commend him for his candor.

The People properly concede the case must be remanded for resentencing, and we agree with the parties that the current sentence is unauthorized.

## DISPOSITION

As to Gonzales, the judgment is affirmed.

As to Armstrong, we remand for resentencing on count two. In all other respects, the judgment is affirmed.


      DUARTE      , J.


We concur:


      HULL      , Acting P. J.


      MAURO      , J.